City of South Miami v. Governor. If we could have a theme for the day, I think it would be justiciability. We're probably going to want to talk about that this morning again. Good morning, your honors, and may it please the court. Chief Judge Pryor, I'll take your invitation to start with justiciability, and I think the place to start here is on traceability and redressability. I'm not sure any of the elements have been satisfied here. Well, I'm not either. I think the clearest ground is traceability and redressability, and let me start with what I think is common ground that we have with the plaintiffs. We all agree that the district court's traceability and redressability analysis was wrong. The district court erred in hinging its analysis on its supposed ability to enjoin the law as opposed to its ability to enjoin the parties, but when we focus on the parties' plaintiff standing cases hopelessly thin, they advance two theories in their brief. The first point to section 908107 of our statute, which allows the governor and the attorney general to sue officers or local governments to ensure compliance with the statute. That theory is foreclosed by Jacobson, and Chief Judge Pryor, you know that opinion much better than I do, but there the plaintiffs sued the secretary of state over the ballot order. The problem was that local officials controlled the ballot order, not the secretary of state. My understanding is that the organization's members allege that they've been racially profiled in the past, and that there's evidence to that effect that was admitted in the district court, but there's no injunction against any local officers, right? That's correct. The only dependence- Presumably, they can do still whatever it is that supposedly injures the organization's members. That's exactly right. The plaintiff's theory is that- And an injunction against the governor and the attorney general doesn't in any way bind any local police officers. That's exactly right. I think it's exactly the same as Jacobson. Plaintiff's theory is that the governor and the attorney general, by virtue of the injunction, can't bring a coercive suit against the local- This is premised on the fallacy that's called the written eraser fallacy, that somehow if a federal court enjoins a state official like the governor or the attorney general, that somehow wipes a law off the books. That's right. Which is just not how law works. That's right, and you said that much better than I could in Jacobson itself. So I think the theory that the governor and the attorney general's ability to bring coercive- Of course, one difference in Jacobson is we were looking at the express powers conferred on the secretary of state as opposed to the powers proposed by law in the superintendent of elections in each of the 67 counties, and it's clear the secretary of state's power was of a very different character or species. But in this case, and help me with it, the legislature took its time to say, because we're so concerned about this problem, sanctuary cities, that we are expressly reposing in the governor variety of powers. One is the specific mention of you can go to court and enforce, but there you're really relying on what a court might do. You don't have anything independent of that, but they say in the first sentence that the and all of the text of the Florida codifications, one of which they mention is that the governor has the power to suspend. So if, for example, a jailer in an unnamed county refused to cooperate with the INS, refused to turn an undocumented alien who had served his or her time over to the INS when there was a detainer, et cetera, the governor could compel that person to do it. He could enforce the provisions of the statute or some of them by suspending him and appointing somebody else to do it. Why isn't that a sufficient conference of direct, immediate, and explicit authority on the governor to enforce the provisions of the statute? Of course, it depends on how it comes up. The governor's not going to intervene if there's cooperation. So it's only, and in that case, if a local officer does something wrong, a party can sue the local officer. But it's the flip side of the coin of enforcement that I'm talking about. And this statute seems to be designed and intended, among other things, to give the governor the power and make sure he uses it to compel compliance. Why isn't that enough here where there's a specific statutory grant of authority in the governor? So I think it's not enough for two reasons. The first is that it relies on a highly speculative assumption that local officials would not comply with this law, but for the risk that they would lose their job. And Chief Judge Pryor, I think you said this earlier this morning better than I could. Public officials do their job out of a sense of duty, a sense of honor, a sense of country, not just because they fear that someone could suspend them from office and ultimately take away their power. The local officials who are the ones enforcing this law have independent obligations under Florida law to comply with the law, whether or not they would risk suspension. On our view, the local officials are going to continue enforcing the law because of that sworn oath to uphold the law, independent of whether the governor has the ability to suspend them. If the legislature passes the law, presumably the local law enforcement are going to respect it. And the plaintiff's own evidence is that the individuals who engage in this profiling are the local police, not the governor or the attorney general, right? That's exactly right. And not to gild the lily, but the only law enforcement officer who testifies at trial says I want this law because I think it's a good law that promotes public safety and the rule of law. So there's just no evidence in the record for plaintiff's deeply cynical assumption that local officials are not going to comply with the law if only they could keep their job. And so I don't think that the governor suspension authority is linked in any way to be traceable to plaintiff's injuries, nor is it likely to address them. And even if it were, you're sorry, Judge Marcus, even if it were, I think would prove would prove far too much because if removability made an executive a copper defendant, then the governor would be a defendant in any case against Florida. I think that's a very powerful, pragmatic argument. The only concern, candidly, that I have with it is if the governor could be sued every time a plaintiff sued a state or local official for some misconduct, that couldn't possibly be the right answer. But is that really a problem here when this legislative body has taken the step to specifically give the governor this power? So we're not worrying about abstract power. We have the state legislature saying to the governor of the state, we expect you to enforce this law. And you've got the power A, B, C, D to do it. You make sure you enforce our law. So it's not a question of the abstract power to suspend. It's the requirement because the legislature told him he had to do it. Isn't that a difference that limits the fallout? I don't think it does. For one, the legislature didn't require the governor to do anything. It said you have available all of your normal executive tools. And I think the legislature just saying, look, governor, you have these powers in the Constitution as you see fit. Use them. Doesn't distinguish this from any other case where the governor has powers available in the Constitution. So I don't think that that would limit the fallout whatsoever. Let me ask you about a different case. Lucky v. Harris, an older one of our cases and a follow up case that came afterwards. But in Lucky v. Harris, a panel of this court some years ago, an older case, 1988 case, our court, the issue there was a suit against the governor of Georgia and some state judges on behalf of a class of indigent persons charged with criminal offenses in Georgia and attorneys representing those defendants alleging they failed to meet minimum constitutional standards and the provision of indigent criminal services. And they were seeking an injunction requiring them to do so. And an issue came up about whether the governor as governor was a proper defendant. And we wrote that the governor was a proper defendant because according to the Georgia Constitution, the government is responsible for law enforcement in the state and is charged with executing the laws faithfully. And the governor had further residual powers. But what was interesting in that case is unlike this case, there was no specific reference in the statute conferring upon the governor that that power. The issue came up again in Georgia Latino Alliance for the governor of Georgia. And I'm not saying these cases are on all fours because I don't honestly think that they are. But there is interesting there. The question also was whether the state offices had were properly named as defendants. And we said our binding precedent from Lucky v. Harris forecloses the argument because we held Georgia's governor is a proper party. In a challenge to the state's indigent defense program because he has sufficient, albeit quote, indirect contact with the program's enforcement. Here, you arguably have something more because you have the specific inference in the statute where the legislature says you got a whole bunch of powers that you can use to enforce this statute. Does that make this a little different? I don't think so, because, again, all the statute says is, governor, please use the executive powers that you already have. It's not a direction to use them. It doesn't constrain them. We've said in our brief that the governor's suspension power under Florida law is inherently discretionary. Let's assume for sake of argument that it even required it even add something to the governor's responsibility. There's nothing about the plaintiff's evidence or this record that contemplates so that the governor is the one who goes out and does the arrest or does the transporting, right? That's exactly right. That's exactly right. Let me ask you one additional question. Let's move aside from traceability. Hold it on the shelf for a second. The first requirement is a concrete injury. In fact, they assert their injury in here is in the fact that they were required to counsel in their folks about the new statute and they cite havens in these other cases. Would you comment on that? What's wrong with that theory as you see it? Sure. So nothing's wrong with that theory in abstract. I think something's wrong with that theory when you get to this proof. And our basic contention is if plaintiffs have failed to show that this law is going to be imminently enforced against them or really anyone in the community in a way that all you're left with when they say that they're spending money is that they're engaging in mine run policy spending. And we know from cases like. They're spending to to address a hypothetical and speculative part. And you can't spend your way into standing. I couldn't have said that better myself, Chief Judifier. That's exactly right. So you require the injury that's required is not just the divergence it's of funds, it's divergence, plus some underlying harm that's tied sufficiently closely to these folks who are suing. Do I have it right? I think that's exactly right. I think we cite cases in our brief that says an organization cannot convert their ordinary program expenses into standing. They actually have to be tied to some real world injury. In fact, otherwise, what you would be saying is any organization that spends any amount of money has standing to challenge any law they don't like. Mr. Azari, and that's tied to what the law is requiring, some new specific thing, right? Like voter ID requirements, something like that. And that's the issue here with the sanctuary city precision and best efforts is it's not precise what it would require them to spend money to divert resources to. I think that's that's right. If you look at the cases that they cite, you know, they're citing cases like Browning, Georgia Latino Alliance. In those cases, what the organizations had identified was that there were people out in the community that were being very clearly affected by the law and they were having to spend money to counteract that because it impinged their mission. There's just no similar factual development. Would you help me then in terms of saying what the law here is for associational standing? With regards to diversion of the funds, have we ever expressed these said the way you're saying it? And maybe you're right that it's injury plus its divergence of you need the plus factor and the plus is the underlying harm must directly and immediately affect the parties. Have we ever said that that simply and directly? I'm not sure that you've ever said it in so many terms. I don't think we have. I think it's implicit, but I'm just trying to get you to help me. Have we ever expressly said that's what associational standing requires? No, I don't think I could point to a specific quote from this circuit. I mean, we've obviously pointed to quotes from other circuits, and I think they're in quotes. And I think the best place I'd point you to is Jacobson, because Jacobson's emphasis on we need to know where the diversion of resources is from, I think, is driving exactly at this point. The reason you need to know where the diversion is from is to know if they're linked in some way to some tangible harm. OK, Mr. Esrae, you've saved four minutes for rebuttal. Let's hear from a slow plan. Thank you. Good morning, Your Honor, may please the court, Kristen Levin, on behalf of Appellees. I'd like to address the elephant in the room, which is very large at this point, which is the question of standing and begin with redressability and traceability. Then I'm happy to also address injury in this case, as Judge Marcus pointed out, the legislature wanted lower level officials to know that the law could be enforced against  express provision within S.U. 168, but exclusively name. But the law operates on local governments, right? It requires local governments to to to do certain things with regard to cooperation with federal officials and transportation and all of that. Right. It requires them to do that and be the governor and that's and it may be that the governor has some ability to go to court or to do other things to make them do that. But it nevertheless still binds them to do that. But the coercive effect of the law is the enforcement power. So you don't think that the these officials who've taken oaths to uphold the Florida Constitution and the law would be obliged to obey what the legislature has told them to do anyway? Your Honor, I would point this court to the court's recent decision in Dream Defenders where the defendant there was the governor. The governor, of course, in part was to to be able to order sheriffs to suppress riots. This was a challenge to the definition of riot. The this court found just over a month ago that the governor was a proper defendant, even though even though lower officials might like sheriffs or local police might still go out and suppress riots under the definition of the challenge. But the governor did some riot suppression, had respired suppression responsibilities, right? Direct responsibility. Sure. But in terms of the obligation, there's no evidence here that the governor or the attorney general, the ones who go out and do the detaining, the cooperation, the transportation is there. There is evidence that that low level officials like the city of South Miami joined this case because they were concerned about the coercive effect of the governor's enforcement power. I don't think that answered my question. Sure, your honor. So the governor, the A.G., do not go out and detain and themselves. Right. But that law that that obliges the local law enforcement to do that anyway, it may it may have an enforcement mechanism for the governor to give them extra incentives to do so. But that law that they're they're sworn to uphold and obliges them to do anyway, they're the ones who actually do it. Your honor, yes. But this court, the standard for redressability under this court's precedent is whether there is a likelihood that that sentence will be redressed as a result of an injunction against the officials. In this case, you have the city of South Miami in a declaration that's back in exhibit five saying that, you know, we don't necessarily want to enforce this law or we think that it's unconstitutional. Well, then they're not the ones that are that are potentially injuring your clients. I mean, your clients allege and have testified that they're that they're racially profiled by law enforcement officers. So presumably not the city of South Miami. Your honor, South Miami is a type of the type of official who you're speaking to the question of whether low level officials across the board will continue to follow a law that has been deemed unconstitutional out of obligation. Well, I'm talking about the kind of local officials who've already caused the alleged entry to the members, the organization's members in the past. Right. Sure. But so in terms of those who have caused injury in the past, we're arguing in this case that there isn't just the injury in the past, that there is going to be an increase in injury because under this under the state, it's not just presumably not from the city of South Miami, from other law enforcement, right? From other law enforcement who are obliged by the state law to do this, regardless of what the district court says to the attorney general, the governor. I mean, this is this is this lawsuit seems to me to be premised on the idea that if you join the governor and the attorney general, that that somehow wipes the law off the books or communicates to local law enforcement who are not actually parties to this litigation, but have done the kind of thing that the organization's members complain about will will will stop enforcing the law. I don't know where that comes from. Your honor, the the notion comes from the idea, of course, of the fact that the Supreme Court in the case says has an impact on what other agencies in that case or in this case officials will do. So in Bennett, the Supreme Court held that the Fish and Wildlife Service was a correct defendant, even though the ultimate decision as to whether to enact a policy that was alleged to harm the plaintiffs in that case. Enacting a policy is one thing. That's the legislature. I'm talking about the actual executive officials, the people who actually do the things that the organization's members complain about. Right. Sure. I am different from the enactment of a policy. But the but the issue is, of course, the fact of having that express enforcing power that it's named the statute hanging over their head. And so the statute is still there. Sure. Of course, your honor. We're not arguing that the statute is. Let me ask the same question in a slightly different way that Chief Judge Pryor is pressing. If indeed you were right. And otherwise were able to establish the merits, if you were right on the question of traceability. And the governor was enjoined from enforcing these provisions. That's standing alone would not prevent, let's say, a jailer in the city of South Miami from complying or not complying. He would still be free to cooperate or not with the INS. And if he did and there was a claim about it, you still would have to sue him individually, wouldn't you? Your honor, if to enjoin him the abstract injunction against him. The governor standing alone. Would not answer the question for the individual officer when it actually got down to the point where the rubber hit the road. Your honor, I agree that at that point you would have to sue the actual jailer or the actual police officer. But the same thing applies in Dream Defenders, where this court affirmed a decision to enjoin the governor, even though you still have sheriffs on the ground who can go out and suppress riots. So it's a it's a parallel situation where there are so many lower level officials who have an obligation to to follow the law. And yet the governor in that case. So it's enough to say the statute conferred upon him the power to enforce in a variety of ways. Even if that's not the end of the rainbow, even if you got the relief you wanted, you'd still have to go back and sue the individual sheriff or jailer or warden. Right, your honor, you would. But the question here in his redressability is whether this injunction increases the likelihood of redressing plaintiff's injuries. And in this case, the governor actually engaged in the riots suppression, had had actual enforcement authority for riot suppression. Right. He had an enforcement authority to tell sheriffs to go out and to suppress riots, just like the governor here has authority to tell municipal police officers how to do their job, to bring to process if they do not enforce the law or your honor, to suspend them, which is if you look at the city of South Miami's declaration of this case, the mayor doesn't instruct them how to to do their job. He doesn't order police officers how to do their job. He only is going to do what you're concerned about if they don't do what you fear. Sure, your honor, that as opposed to the officers who are going to be obliged to do what you say officers have done to the organization's members anyway, and I don't think the city of South Miami, which labels itself a plaintiff, helps you with your concern about what potential defendants do. Your honor, in terms of the difference between ordering to suppress as opposed to compelling to suppress through some sense of, you know, if I don't suppress this riot or in this case, if I don't follow SB 168, I might fall. I might find myself suspended from office by the governor. I think that, again, the because of cases like that and because of the emphasis on coercive effect, that's a distinction without a difference when it comes to the question of crease and regressibility here. Ms. Loveland, can I turn away from regressibility and traceability to injuring fact? Of course. So you need an injury, in fact, for each of your claims, right? So the best efforts, the sanctuary cities and the transport provision. Yes, your honor. What evidence of the injury, in fact, my understanding is racial profiling, but I saw all of that related to best efforts in sanctuary city. What was the racial profiling evidence for the injury related to transport provision? Your honor, there's there's evidence in the sense that the organization's diverted resources in order to hold know your rights sessions and respond in other ways to the entirety of the law. And I'd like to address the difference between organizational and associational standing. Well, what's the injury, though, stemming from the transport provision? And here's my concern. Racial profiling that the evidence that was introduced at trial had to do with like traffic stops, that sort of thing. But the transport provision has to do with the federal government initiating a detainer request sent to jailers and sheriffs and whoever's holding inmates in custody. And I don't see how there could be any racial profiling with the recipients of those detainers because it's initiated by the federal government. Your honor, the fact that you have individuals who have been racially profiled who are then brought into custody and are then subject to detainer requests links that injury of the detainer request and the transport itself. So if you look at page 30 of the district court's opinion, it it says unrebutted testimony about an individual who was put over for traffic citation, then brought into custody, never actually cited for the traffic violation, goes into custody, ends up that there is a detainer. He's subject to a detainer request and thereby goes into into federal custody after that. So you can see the link between the racial profiling injury or just the injury of being picked up by by a local police officer as a result of SU-168 and in ending up sort of subject to the transport provision. Help me with organizational standing. Let's hold aside the second theory of the organization representing the interests of its members, the associational theory, just the organization theory. In your view, is it enough to say that an organization diverted its resources from A, B, C and D to do E, which was counseling its members about a new law? Is that enough to establish Article three organizational standing? Your Honor, under this court's case law, I believe it is enough. If you look at cases like Common Cause, you had the NAACP engage in broad voter mobilization efforts. It's typical work is to drive individuals to the polls as a result of a voter ID law. They have to shift. It will certainly affect its members when they go to vote. Your Honor, there's also evidence here, but I do think that that conflates organizational and associational standing. If organizational standing requires demonstration that one's members will be affected. So as long as an organization spends money to to educate members about a completely speculative and hypothetical harm from a new law for those members, you get into federal court understanding. Your Honor, the the organizational injury is to the organization itself. Right. And that's what distinguishes that they can just spend their way into standing every time. You based on this court's case law, if you look at Hispanic if you look at Hispanic interest, that's the organization. But here's the the problem. When you look at the cases that we have. In each of the instances where this court has said organizational standing is enough, I'm not talking about associational, there's something more. It's not only the diversion of funds, but there's an imminency of a statute that's affecting the organization and its members. So suddenly, instead of doing A, B and C in terms of registration, I've got to do D. And it's right here. It's right on top of me. It's immediate. The problem I think that you have. Is here the associational injury to it, the diversion. Is a whole stretch away, it's attenuated from the harm that the statute potentially may yield. And it's not right on top of you. And if your answer is right, then it seems to me what you're saying is it is enough to divert funds from, say, prenatal care, which is clear and immediate, or from sending your folks out to check on whether there's domestic violence, because we now want to educate our statute, which may or may not, depending on the context, affect the organization or its members. Doesn't there have to be something, a whole bunch closer between the diversion and the statute itself that you're educating them about? There are two responses. First, I think that there's an assumption in the case law that an organization does not do what they consider to be a harm, some sort of injury to. It might be obvious in those cases. Your Honor, it may be that it seems obvious and more obvious in those cases. But I think that, again, the organizational standing is based on the idea that organizations don't kind of throw their money around or divert their energies and the resources in their money away from their core missions to something else. Unless they think there's a real good reason for doing it. But is that enough to use the words of Judge Pryor to spend your way into Article 3 standing? Suppose, in fact, hypothetical, I'm not saying it happens here, an organization doesn't like a piece of legislation that legislature passes. They lose before the legislature and they want to use the court as an instrument to challenge the wisdom and efficacy of the policy the legislature adopted. And they spend their money generally on A, B, and C. And now we're going to move into D to attack D, even though D, the statute itself, is so to say we diverted our resources and our judgment is enough, even if it was idle and fanciful. Your Honor, I think your question gets a little bit to the idea of a tester case, and that's effectively what you're discussing, correct? And the Supreme Court has made clear that it's completely OK for an individual or an organization to bring tester cases as recently as last term's decision in FEC v. Cruz, where there was evidence in the record that Senator Cruz had, in fact, there was a campaign finance law that he wanted to challenge and kind of arranged the kind of finances of his campaign in a particular way. So in order to be able to bring that challenge, that goes all the way back to Havens Realty. So the Supreme Court has said that even if we have evidence that the case has been brought just to test the challenge, as long as there is actual injury to the plaintiff, that is sufficient for standing. I would also point out in this case that we do have evidence of imminent injury on behalf of the members of these organizations. So if you look at page 25. We're talking now about associational rather than organizational injury. Have you moved into the second category? I mean, they kind of blend, but now I think you're moving into the other. To the extent that this court believes, and I believe that they are separate categories in that one does not need to prove associational standing in order to demonstrate organizational standing. But the extent this court thinks that there is a blend between them, there is evidence in the record that that plaintiff's members were injured by this law. If you look at page 25, you have AI Justice, one of the plaintiff organizations. This is in the district court's post-trial opinion, unrebutted testimony that they work with those who have been who are inmates in federal facilities and on the ground. In the case of SC168, just 20 to 30 percent of their clients had ended up in federal custody as a result of interactions with local law enforcement. Whereas after SC168, over 46 percent of the individuals they worked with had ended up in federal custody as a result of interactions with local law enforcement. So we see the effect of SC168 on the ground, on the organization's members. Let me ask you a final question, at least from me. If you're required to wait until a local jailer or a state officer does something wrong to sue, you're perfectly free to come back in and attack the constitutionality of any or all of SC168, aren't you? Your Honor, we would be, but I don't think it's necessary here, given the express enforcing power that was given to the governor and the AG in SC168 and given the merits of the discriminatory intent by which this law was enacted. Thank you. OK, Ms. Leveland, thank you. We're going to hear from Mr. Esrae. You have four minutes. Got anything you want to say? Thank you, Your Honors. Just a couple of hopefully very quick points. My friends on the other side point repeatedly to this argument that the governor, the attorney general's ability to bring suit has sufficient coercive pull to make them traceable defendants. I just think that's in the teeth of this court's decision. In Jacobson, this court could not have been clearer. It said, quote, that the secretary must resort to judicial process, supervise, and prosecute. Of course, the difference between that case and this is it wasn't just the power to go to court to enforce, where the governor could only ask. Here, the governor has the whip hand. He can do more than ask. He can suspend any state or local officer whom, in his judgment, is not properly enforcing the law. Is that a distinction of meaning or is that without any meaning here? I mean, I think it's a distinction with Jacobson. I think it doesn't ultimately get to standing because all of those officials that the governor could suspend for not following the law are independently obligated to follow the law. And on our view, it's just deeply cynical to conclude that the only reason they are not following the law is that they risk being suspended by the governor if they don't do so. That's why we think that all of these local officials, that their own evidence that they're telling you is that local officials are following this law because local officials are legally obligated to do so. Just a word about injury. Plaintiffs, I think, basically admit that as long as they spend money on anything they have standing, I think that asks this court to create a circuit split with the Shelby case that we cite from the Sixth Circuit. I also think it's flatly inconsistent with Clapper. On plaintiff's theory, if Amnesty International had just spent a dime, that case would have turned out exactly differently. I don't think that the Supreme Court or this court's case law is built on such a tenuous read. On associational standing, plaintiffs say that there's evidence in the record that members are being discriminated against. I just urge you to go look at the cross-examination. They have no idea what the races of their members are, why the traffic stops are being initiated, or even who is the people pulling them over. Some of their evidence is before the effective date of this law even went into effect. Now, I just want to say one and really no evidence that that what anything that happened after was attributable to this law. That's exactly right. Now, I just like to say one very brief word on the merits, because I think that we've seen a pattern in this court's case law where you have these cases come up, there's no standing. And then that's what happened in cases like Lewis. But district courts continue to get Arlington Heights wrong. And so I think if the court can, I would encourage the court to say something about the merits, because we see this pattern happening again. In your view, what did they get wrong about Arlington Heights? Sure. So I think the district court failed to apply the presumption of legislative good faith. That's straight out of the Supreme Court's decision in Abbott v. Perez. It's the error that was identified by this court in the League of Women Voters case. I think the district court failed to consider the entire law. It said nothing. If they said anything about this in the absence of standing, we would be rendering an advisory opinion, wouldn't we, about the merits? I don't think so when the case is properly here. And you've seen it twice recently. So Judge Branch is here as an appeal is properly here. But if we conclude that the district court lacked subject matter jurisdiction, that this was not a justiciable controversy. And we address the merits, we would be issuing an advisory opinion, wouldn't we? I don't think so in the way that advisory opinions. I just point the court. Judge Branch issued a concurrence in the Marjorie Taylor Greene case, a concurring opinion. Well, sure. I mean, I can see that it would not be binding. And we think that it'd be useful for law or something that ought to be the subject of a of a panel or majority opinion. Right. On the on subject matter jurisdiction. I just be oh, by the way. And we think the merits here just that this this ruling is bonkers. Well, I mean, I do think that that would be helpful to lower courts. I think it's telling that every single state in the circuit is here signing a brief. But isn't that properly raised in a concurring, not a majority opinion is the question the chief judge is asking. I think we'd be quite happy with a concurring opinion saying that. Thank you. It would be it would be improper, would it not for a majority opinion to say, on the one hand. There's no article three standing, the district court had no power to enter the order that it did. You'll have to wait for another case, another time where it was clear and immediate. And then to go on and say, oh, and by the way, on the merits, there was an error in these four respects that be a mistake. I don't necessarily think it'd be a mistake. I mean, if you denominated wouldn't be a holding, would it? It would not be a holding. We agree it would not be a holding. And then the question is just, is it part of a separate opinion labeled concurrence? Is it part of a majority opinion that Mr.